IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re | Chapter 11 |
| PHOENIX EQUIPMENT COMPANY, INC., | Case No. 2:08-bk-13108-SSC |
| Debtor. | |
| PARK WESTERN FINANCIAL CORPORATION, an Arizona corporation dba PARK WESTERN LEASING | (Not for Publication- Electronic Docketing ONLY) |
| Movant, | |
| v. | **MEMORANDUM DECISION CONCERNING WHETHER AN AGREEMENT IS A TRUE LEASE** |
| PHOENIX EQUIPMENT COMPANY, INC., | |
| Respondent. | |

I. INTRODUCTION

On December 12, 2008, Park Western Financial Corp. dba Park Western Leasing ("Park Western") filed a "Motion to Compel Debtor to Assume or Reject Equipment Leases; [or] in the Alternative, Motion for Relief from Automatic Stay to Permit Possession and Disposal of Certain Lease Equipment" ("Motion to Compel"). On January 5, 2009, the Debtor, Phoenix Equipment Company, Inc., ("Debtor") filed its Response to Park Western's Motion to Compel. After a series of pre-trial matters, scheduling conferences, and evidentiary hearings were held,

1

the parties filed post-trial memoranda of law.  Thereafter the Court took the matter under advisement.

Taking into account the evidence presented at trial, the arguments of the parties, the documents filed, and the entire record before the Court, the Court has set forth in this decision its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52, Bankruptcy Rule 7052.  The Court has jurisdiction over this matter, and this is a core proceeding.  28 U.S.C. §§ 1334 and 157 (West 2009).

## II.  FACTUAL HISTORY

The Debtor and Park Western have entered into a number of transactions over the years.  As of the summer of 2001, both parties described their business relationship as successful.  The Debtor needed equipment for its excavating operations, and Park Western provided the financing or the equipment to the Debtor.  During the course of their relationship, the Debtor and Park Western entered into no fewer than ten transactions concerning the financing or lease of equipment.  However, the Debtor experienced financial problems, and on September 26, 2008, the Debtor filed its voluntary Chapter 11 bankruptcy petition.  Now the Debtor seeks a determination from this Court as to the nature of its transactions with Park Western.  The agreements currently at issue have been labeled "leases" by Park Western and have been  consecutively numbered, beginning with number 262401 and ending in number 262410.[1]

The first agreement, No. 401, was purportedly a sixty-month lease for a 2002 Trail King Trailer.[2]  The Debtor selected the equipment, and Park Western purchased the equipment and leased it back to the Debtor.  Although not provided for within the four corners of

---

**1.** Throughout the Decision, references to the leases shall be based upon the last three numbers of the lease.  For example, lease number 262401 shall be referred to as 401.

**2.** *See* Debtor Exhibit A.

2

the contract, the parties verbally agreed to a 10 percent purchase option at the end of the lease.[3] At the end of the lease term, the Debtor exercised the purchase option.

Park Western entered into a number of agreements with customers such as the Debtor. The terms and conditions of the other the agreements had conditions which were similar to secured transactions. For instance, whenever a customer entered into more than one alleged lease agreement with Park Western, it was required to use the equipment that was the subject of earlier leases as "collateral" for the alleged new lease. Park Western described this document that provided "collateral" to it as a Continuing Cross-Collateralization Agreement. Any item of equipment that had previously been leased to a customer became security under the Cross-Collateral Agreement to ensure repayment of any other obligations that were due and owing by the customer to Park Western. Furthermore, the Cross-Collateral Agreement provided that if a customer exercised its purchase option at the end of an agreement, concerning a particular item of equipment, Park Western had the option to retain the title to the equipment as "additional security" for any outstanding obligations between the parties. According to Park Western, when a customer completed the term of the lease and exercised its purchase option, Park Western's decision to release its "security interest" in the equipment, and return the document of title to the customer, or retain the item of equipment as ongoing collateral for future transactions was based upon an analysis of the customer's payment history and what other items of equipment remained as security for any obligations still due and owing to Park Western. The better the "payment history" and "collateral position," the more likely it was that Park Western would release its security interest in the equipment.

Since the Debtor entered into multiple leases with Park Western, it was required to execute Continuing Cross-Collateralization Agreements. Since the Debtor entered into ten

---

**3.** The 10% figure was based upon the original purchase price of the equipment provided to the Debtor. For example, if the purchase price of the equipment was $200,000, then the purchase option would be $20,000. It was not related to the fair market value of the equipment.

3

alleged lease agreements, Nos. 401 through 410,[4] it was required to enter into nine separate Cross-Collateralization Agreements.[5]

Prior to the start of 2008, the Debtor was current on all of its obligations with Park Western, and the relationship between the parties was positive. The Debtor had paid, in full, Agreement Nos. 401 through 403, and the Debtor had exercised its purchase option on these three "leases." Upon exercising its purchase option under No. 401, the Debtor retained possession of the equipment. However, Park Western determined that the item of equipment that was the subject of the No. 401 "lease" would become security for the repayment of the Debtor's other obligations to Park Western under the Continuing Cross-Collateralization Agreements. As to agreements Nos. 402 and 403, Park Western released any interest that it had in the equipment by returning the equipment titles to the Debtor.

On or about June 1, 2007, the Debtor and Park Western entered into Agreement No. 407 for a 2006 CPS End Dump. Approximately one year later, Scott Stern ("Mr. Stern"), the principal of the Debtor, discussed with John Lieber ("Mr. Lieber"), a business development manager for Park Western, the Debtor's need for up to $500,000 in additional working capital. As a result of these discussions, Mr. Lieber spoke with James Mangieri ("Mr. Mangiri"), the senior vice president of Park Western, about the possibility of providing the Debtor with the necessary financing. In order to facilitate the transaction, Messrs. Mangieri and Lieber decided to enter into an agreement whereby Park Western would purchase certain used equipment from the Debtor, and would then lease this same equipment back to the Debtor. Park Western described the transaction as a sale-leaseback arrangement.

---

**4.** *See* Docket No. 45; Exhibit A.

**5.** The Debtor was not required to enter into a Continuing Cross-Collateralization Agreement until it entered into its second "lease." Thus, the Continuing Cross-Collateralization Agreements were only required for Agreements Nos. 402 through 410. Although only one exhibit of the Continuing Cross-Collateralization Agreement was submitted into evidence, Mr. John Lieber, of Park Western, testified that the Debtor entered into nine separate Continuing Cross-Collateralization Agreements.

4

1       Because the Debtor needed the working capital, Mr. Stern, on behalf of the

2 Debtor, provided Park Western with a list of all of the Debtor's equipment which it owned free

3 and clear of any security interest. Park Western then selected a total of eighteen pieces of

4 equipment which it agreed to purchase from the Debtor for approximately $514,000.[6] Although

5 Mr. Stern requested one agreement, Park Western separated the equipment into two separate

6 agreements, Nos. 409 and 410. Each agreement, however, only described seven pieces of

7 equipment. Mr. Lieber, of Park Western, explained that only fourteen items of equipment were

8 listed, because they were utilized on the road and, hence, had separate certificates of title issued

9 with respect to them. The remaining four items, however, did not have certificates of title, so

10 Park Western created two separate Additional Collateral Agreements, and listed two untitled

11 pieces of equipment in each of the Additional Collateral Agreements. Park Western then filed

12 these Additional Collateral Agreements, along with separate UCC Financing Statements, with

13 the Arizona Secretary of State.

14       Beginning in February or March of 2008, Mr. Stern testified that the Debtor

15 experienced a business slowdown, and as a result, the Debtor began to fall behind in its

16 payments to Park Western. By this time, the Debtor still had at least six outstanding agreements

17 with Park Western, Nos. 405 through 410.[7] Since the Debtor was not using all of its equipment,

18 it approached Park Western about the possibility of selling certain pieces of equipment subject to

19 Nos. 409 and 410. Park Western agreed to the sale of four pieces of equipment selected by the

20

21

22
_____

23    **6.** Park Western testified that it selected nineteen pieces of equipment. However, in
reviewing the leases, it appears that there were only eighteen pieces of equipment included in the

24 "leases" and associated Continuing Cross-Collateralization Agreements.

25    **7.** The parties did not present evidence regarding No. 404. Accordingly, it is unclear

26 whether the Debtor was still making payments on this agreement at the point when it began to
fall behind in its payments.

27

28                   5

Debtor, and the Debtor proceeded with the sales of the equipment. Three separate sales took place over a short period of time.[8]

The Debtor sold the first piece of equipment for approximately $85,565. Park Western utilized the sale proceeds to make the remaining monthly payments due under Agreement Nos. 405 and 408, to allow the Debtor to exercise the 10 percent purchase option on Agreement Nos. 405, 406, and 408, and to allow the Debtor to make the July 2008 payments on Agreement Nos. 407, 409, and 410.[9] However, even though the sale proceeds allowed the Debtor to pay all obligations arising under three of the agreements, Park Western did not release its security interest in the equipment. Instead the items of equipment remained as collateral for any other obligations that the Debtor owed to Park Western pursuant to the Continuing Cross-Collateralization Agreements. After all of the payments were made, as outlined above, Park Western utilized the remaining balance of $23,882.99 from the sale of the item of equipment as a new type of security deposit under No. 407.

Park Western attempted to justify its allocation of the sale proceeds. It set forth its standard policy of applying the sale proceeds to the final payments due and owing under an agreement, not for the payment of any future obligations due and owing under any other agreement. Thus, the Debtor was required to continue making its monthly payments under No. 407 until the agreement had a remaining balance of $23,882.99. Then, and only then, could the Debtor apply the new security deposit in the amount of $23,882.99 in reduction of the final payments under the agreement, with the Debtor being offered the opportunity to purchase the equipment for the 10 percent purchase option.

The Debtor disagreed with this application of the sale proceeds. The Debtor first argued that instead of making the July payments under Agreement Nos. 407, 409, and 410, all of the sale proceeds should have been applied to pay off one or more of the agreements. According

---

**8.** There were two sales of one piece of equipment, and one sale of two pieces of equipment.

**9.** *See* Debtor Exhibit G.

6

to the Debtor, if the proceeds had been applied in this manner, there would have been sufficient net proceeds to pay all of the obligations due and owing under Agreement No. 407. Moreover, the Debtor argued that even if the proceeds were not used in such a manner, the sum of $23,882.99 should have been applied to future payments under the agreements, rather than as a security deposit. Finally, the Debtor argued that just as in the case of Nos. 402 and 403, Park Western should have released its security interest in the equipment instead of requiring that the item of equipment remain as collateral for any obligations still due and owing to Park Western. If Park Western had released its interest in the equipment, the Debtor could have sold the equipment in order to raise additional capital.

After the first sale, the Debtor sold the remaining three pieces of equipment. These sales provided Park Western with net proceeds in the amount of $77,168.99. Although the net proceeds from these three sales provided Park Western with sufficient funds to pay off the remaining obligations under Agreement No. 407, including the 10 percent purchase option payment, Park Western did not so apply the proceeds. Instead, it chose to hold the net proceeds as an additional security deposit. According to Park Western, it would have paid off Agreement No. 407, but it did not want to do so without approval of this Court.[10] Park Western still retains the security deposit in the amount of $23,882.99 as to Agreement No. 407, and the net sale proceeds of $77,168.99.

### III. LEGAL ANALYSIS

The Debtor argues that although Park Western filed a Motion to Compel, these "leases" are actually disguised security agreements, and the Debtor will appropriately treat Park Western as a secured creditor in its plan of reorganization. Park Western takes the opposite

---

**10.** The parties agree that the final sales took place prior to the Debtor filing its bankruptcy petition, so it is unclear why the proceeds were not used to pay off Agreement No. 407.

7

1  position, arguing that these are leases which the Debtor should be compelled to assume or reject

2  pursuant to 11 U.S.C. § 365.

3          Determining whether an agreement is a true lease or a disguised security

4  agreement is governed by state law. <u>Butner v. United States</u>, 440 U.S. 48, 54, 99 S.Ct. 914, 59

5  L.Ed.2d 136 (1979).[11]  A.R.S. § 47-1203  provides as follows:

**A.** Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.

**B.** A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:

1. The original term of the lease is equal to or greater than the remaining economic life of the goods;
2. The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
3. The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration on compliance with the lease agreement; or
4. The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration on compliance with the lease agreement.

**C.** A transaction in the form of a lease does not create a security interest merely because:

1. The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;
2. The lessee assumes risk of loss of the goods;
3. The lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording or registration fees or service or maintenance costs;
4. The lessee has an option to renew the lease or to become the owner of the goods;
5. The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or
6. The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

**D.** Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised. Additional consideration is not nominal if:

1. When the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal

---

**11.**  The parties do not disagree that the law of Arizona applies to their dispute.

8

determined at the time the option is to be performed; or

2. When the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed.

**E.** The "remaining economic life of the goods" and "reasonably predictable" fair market rent, fair market value or cost of performing under the lease agreement must be determined with reference to the facts and circumstances at the time the transaction is entered into.

The Arizona statute, however, is modeled after UCC § 1-203.[12] Therefore, a brief history of UCC § 1-203 is pertinent to analyzing whether an agreement is a true lease or a disguised security agreement. Prior to 1987, UCC § 1-203 (West 1986) stated as follows:

Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Based upon this language, the courts fashioned a multi-factor approach in determining whether an agreement was a true lease. However, the critical factor in the approach was ascertaining whether the parties intended a lease or a security agreement at the inception of the contract.

Over the years, the drafters of the Uniform Commercial Code had received a number of requests to revise Section 1-203. In 1987, the drafters concluded that Section 1-203 should be amended and provided the proposed language. In Comments to the revised Section, they stated:

[r]eference to the intent of the parties to create a security interest has led to unfortunate results. In discovering intent, courts have

---

**12.** "UCC" refers to the Uniform Commercial Code, which is prepared and reviewed by a distinguished group of practitioners and academics, appointed by each state, the District of Columbia, the Commonwealth of Puerto Rico and the United States Virgin Islands. Each State and territory then reviews the proposed provisions and decides whether to adopt the Code as written, or to modify it to be consistent with applicable State law. In this case A.R.S. § 47-1203 is virtually identical to UCC § 1-203. The definition of "present value" formerly embedded in Section 1-201(37) has been placed in Section 1-201(28), and is also found at A.R.S. § 47-1201(28). It's important to note that UCC § 1-203 was formerly labeled UCC § 1-201(37).

9

relied upon factors that were thought to be more consistent with sales or loans than leases. Most of these criteria however, are as applicable to true leases as to security interests . . . . Accordingly, amended Section 1-201(37) deletes all references to the parties' intent.

In creating the revised UCC § 1-201(37), the drafters sought to refocus the attention of the courts and the parties to a small set of objective factors commonly associated with a true lease versus a security agreement. Accordingly, the drafters eliminated all references to the parties' intent. The revised version, UCC § 1-203, now provides:

(a) Whether a transaction creates a lease or security interest is determined by the facts of each case.

(b) A transaction in the form of a lease creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:

 (1) the original term of the lease is equal to or greater than the remaining economic life of the goods;
 (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
 (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or
 (4) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(c) A transaction in the form of a lease does not create a security interest merely because:

 (1) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;
 (2) the lessee assumes risk of loss of the goods,
 (3) the lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording, or registration fees, or service or maintenance costs;
 (4) the lessee has an option to renew the lease or to become the owner of the goods,

10

(5)  the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(6)  the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

(d)  Additional consideration is nominal if it is less than the lessee's reasonably predictable costs of performing under the lease agreement if the option is not exercised.  Additional consideration is not nominal if:

(1)  when the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or

(2)  when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed.

(e)  The "remaining economic life of the goods" and "reasonably predictable" fair market rent, fair market value, or cost of performing under the lease agreement must be determined with reference to the facts and circumstances at the time the transaction was entered into.

UCC § 1-203 establishes a two-step test for determining whether an agreement constitutes a true lease or a disguised security agreement.  Under the first step of the test, the courts are to apply what has been described as the "Bright-Line Test."  The Bright-Line Test is derived from Section 1-203(b) which sets forth the objective criteria to determine whether the parties have entered into a security agreement.  In the two-part test, the courts must ascertain (i) whether the lease is terminable by the lessee, and (ii) whether at least one in a series of four enumerated conditions is met.  If the lease is not terminable by the lessee and one or more of the enumerated conditions is present, then the contract is a *per se* security agreement, and the court's analysis may conclude.

However, if the lease is terminable by the lessee, or if the lease is not terminable by the lessee but none of the enumerated conditions is present, then a security interest will not be

11

conclusively found to exist, and the court will need to consider other factors. Most courts which have been required to complete a further factual analysis have focused their attention on whether the facts reflect that the lessor has retained a "meaningful residual interest" in the goods. Addison v. Burnett, 41 Cal.App.4th 1288 (1996). In determining whether the lessor has retained an economically meaningful residual interest in the goods, courts must look to the economic effect of the purported lease agreement, rather than the intent of the parties. In re QDS Components, Inc., 292 B.R. 313, (Bankr. S.D.Ohio 2002).

Under both the Bright-Line Test and the subsequent factual analysis, if necessary, most courts have focused their attention only on those facts which existed at the time the parties entered into the agreement. "When the parties sign the contract and become bound, they have either made a lease or a security agreement. That agreement is based upon their present judgments about values, useful life, inflation, risk of non-payment, and other matters . . . . Foresight not hindsight controls." James J. White & Robert S. Summers, Uniform Commercial Code vol.4 § 30-3, 9 (5th ed. West 2002). This analysis "focuses on all the facts and circumstances surrounding the transaction as anticipated by the parties at the contract inception . . . ." In re Grubbs, 319 B.R. 698, 717 (Bankr. M.D.Fla. 2005). This Court will now apply the objective factors outlined above to the facts of this case. In determining the various objective factors which are now required under Section 1-203(b), the party seeking to challenge the nature of the agreement carries the burden of proof by a preponderance of the evidence. In this case, Park Western has requested that the Debtor assume or reject the agreements. The Debtor questions the nature of these agreements, seeking to recast them as security agreements. Under these facts, the Debtor carries the burden of proof. In re WorldCom, Inc., 339 B.R. 56 (Bankr. S.D.N.Y. 2006).

A. Bright-Line Test

The first prong of the Bright-Line Test requires the Court to determine whether the contract is terminable by the lessee. In this case, the explicit terms of the underlying

12

agreements,[13] as well as the testimony of the Debtor's principal and the representatives of Park Western are clear that the agreements were not terminable by the Debtor, as lessee. Accordingly, the first prong of the Bright-Line Test is met.

The Court must now determine whether one of the factors set forth under Subsections (1) through (4) of the security interest test has been met. As a preliminary matter, since the agreements do not provide for mandatory or optional renewal, it is unnecessary for the Court to consider Subsections (2) and (3) of the Bright-Line Test, as both of these sections focus on a lessee's duty or option to renew the lease. Furthermore, the parties agree that at the inception of the agreements, they anticipated that the equipment subject to the agreements would have economic life at the end. Therefore, Subsection (1) is not applicable to these agreements. Thus, the Court must only determine whether the agreements contained a purchase option. If the Court so finds, then the remaining issue is whether the purchase option in one or more of the agreements was nominal.

The agreements at issue in this case are Nos. 407, 409, and 410. Agreement No. 407 consists of the lease, as well as a Continuing Cross-Collateralization Agreement, while Agreement Nos. 409 and 410 consist of the leases, the Cross-Collateralization Agreements, and an Additional Collateral Agreement.[14] Pursuant to the Additional Collateral Agreement, the Debtor pledged numerous items of equipment as additional collateral to secure the Debtor's performance under the lease agreements. [15] The Additional Collateral Agreements contain language that specifically prohibited the sale of the collateral, and the use of such proceeds to be applied to any lease payment or obligation pursuant to the underlying lease agreement.[16] Even though the agreement prohibited the use of proceeds, the course of dealing between the parties

---

**13.** *See* Docket No. 45; Exhibit A. On page 1 of the leases, between Paragraphs 3 and 4, the language explicitly provides "THIS LEASE IS NOT CANCELABLE OR TERMINABLE BY LESSEE."

**14.** *See* Park Western Exhibits 5 and 6.

**16.** *See* Park Western Exhibits 5 and 6, Line 4 on the first page of each exhibit.

13

was to allow it.  Moreover, none of the leases contain any language which allows the Debtor the

option to purchase an item of equipment at the expiration of the agreement.  Nevertheless, the

evidence presented by both the Debtor's principal and the representatives of Park Western

reflects that the Debtor had an unwritten or verbal option to purchase the equipment at the

expiration of any lease for 10 percent of the original cost of the equipment.

Is such an oral agreement enforceable?  When interpreting a contract, the courts

may consider the parties' course of dealing.  A course of dealing is defined as "a sequence of

conduct concerning previous transactions between the parties to a particular transaction that is

fairly to be regarded as establishing a common basis of understanding for interpreting their

expressions and other conduct." A.R.S. § 47-1303(B).  The existence of a course of dealing

between two parties is a question of fact.  <u>Mobile Discount Corp. v. LuBean</u>, 134 Ariz. 350, 353,

6565 P.2d 639, 642 (Ariz. App. 1982).  A course of dealing may be used to ascertain the

meaning of the parties' agreement, to give particular meaning to specific terms of the agreement,

and to supplement or qualify the terms of an agreement.  A.R.S. § 47-1303(D).  The express

terms and course of dealing must be construed as consistent with one another whenever such a

reading of the contract terms is reasonable.  A.R.S. § 47-1303(E).  However, if such a consistent

reading is not possible, then the express terms of the contract will prevail over the parties' prior

course of dealing.  <u>Id</u>.

At issue is the treatment of the equipment when the lease term expires.

Paragraph 13 of the leases,[17] which deals with this issue, states:

> **SURRENDER**. By this Lease, Lessee acquires no ownership
> rights in the Equipment.  Upon the expiration, or earlier
> termination or cancellation of this Lease, or in the event of a
> default . . . Lessee, at its expense, shall return the Equipment . . .
> by delivering it . . . to such place as Lessor may specify.

The parties agree that in the course of their relationship, this language has always

been contained in their agreements.  However, the parties state that despite this language, the

---

**17.** *See* Park Western Exhibits 1, 2, and 3.

14

1  Debtor has always had the option, at the expiration of any lease, to purchase the equipment for

2  10 percent of the original cost of the equipment.  Park Western concedes that for purposes of

3  Agreement Nos. 407, 409, and 410, the parties again verbally agreed that the Debtor had a 10

4  percent purchase option upon the expiration of the agreements.  Furthermore, when the Debtor

5  fell behind in its payments under the agreements, Park Western allowed the Debtor to select and

6  sell certain pieces of equipment subject to the agreements, and Park Western allocated a portion

7  of the net proceeds to the payment of the 10 percent purchase option to certain items of

8  equipment.

9          The Court finds that the parties course of dealing provided the Debtor with the

10  option to purchase the subject items of equipment for 10 percent of the original cost of the

11  equipment.  The Court also finds that this purchase option does not contradict Paragraph 13 of

12  the lease.  Park Western never implemented this provision of the agreement.  Rather than

13  requiring a surrender of the equipment, Park Western never specified a place for the Debtor to

14  return the item of equipment.  Park Western supplemented Paragraph 13 of the lease by allowing

15  the Debtor to pursue an option to purchase one or more items of equipment at a fixed price of 10

16  percent of the original cost of the equipment.  Accordingly, the parties' course of dealing

17  establishes that Agreement Nos. 407, 409, and 410 included a 10 percent purchase option upon

18  completion of the contract.

19          Having determined that a purchase option exists, the Court must next consider

20  whether such a purchase option is "nominal."  UCC § 1-203(d)(2) provides that the option to

21  purchase is not nominal if the purchase price represents the fair market value of the goods as of

22  the date in which the lease has been entered into between the parties.  UCC § 1-203(d) also

23  provides that additional consideration is nominal, if "it is less than the lessee's reasonably

24  predictable cost of performing under the lease agreement if the [purchase] option is not

25  exercised."  Based upon this record, the Court is unable to determine whether the purchase

26  option is nominal.  "The date of the transaction, rather than a future date, is the more appropriate

27

28                                                  15

point to determine the adequacy of the option price." In re Zaleha, 159 B.R. 581, 586 (Bankr. D.Idaho 1993); *See also*, In re Marhoefer Packing Company, Inc., 674 F.2d 1139 (7th Cir. 1982); In re WorldCom, Inc., 339 B.R. 56 (Bankr. S.D.N.Y. 2006). The Bright-Line Test focuses on specific valuations placed on the goods at the time that the parties entered into the contract. However, under the Bright-Line Test, the Debtor has failed to present any valuation evidence to establish, at the inception of the agreements between the parties, its estimates regarding the fair market value of the equipment when the leases would expire, or the costs of not exercising the purchase options at the expiration of the leases. Therefore, the Court is unable to determine, under the Bright-Line Test, that the purchase option is nominal. Since the Court is unable to find one of the enumerated factors under the security agreement part of Section 1-203(b), the Court must consider whether additional facts associated with the transaction evidence that the agreements between the parties were in the nature of disguised secured transactions.

B. Facts of the Case:

Since the Debtor has been unable to meet the objective factors set forth in the Bright-Line Test, the Court must next determine whether, based upon the facts of the case, the contract is a disguised security agreement. *See* UCC § 1-203(a). "[T]he determination of whether an agreement creates a true lease . . . or a security interest . . . is dependent on the economics of the transaction." PSINet, Inc. v. Cisco Systems Captial Corp., 271 B.R. 1, (Bankr. S.D.N.Y. 2001); In re WorldCom, Inc., 339 B.R. 56, 69 (Bankr. S.D.N.Y. 2006). In the absence of statutory guidance, a majority of courts have determined that such an inquiry is based upon "whether the lessor has retained a meaningful reversionary interest in the goods." Addison v. Burnett, 41 Cal.App.4th 1288 (1996).

Two factors are considered as having great significance in determining whether the lessor has retained a meaningful reversionary interest in the goods. These two factors are: (i) whether the lease contains an option to purchase which is nominal and (ii) whether the lessee

16

1  develops equity in the property, such that the only economically reasonable option for the lessee

2  is to purchase the goods.  Addison v. Burnett, 41 Cal.App.4th at 1296; In re Zaleha, 159 B.R.

3  581, 585 (Bankr. D.Idaho 1993).  However, although these factors are most commonly used in

4  determining whether the Debtor retained a meaningful reversionary interest, the Court is not

5  limited to these two factors alone.  In re WorldCom, Inc., 339 B.R. 56, 72 (Bankr. S.D.N.Y.

6  2006).  In fact, as other courts have observed, these two factors seem to provide a redundant

7  examination of those items already considered in the Bright-Line Test.  Id. at 73; In re QDS

8  Components, Inc., 292 B.R. at 343 n. 20.  Accordingly, the Court finds that it is not limited to

9  simply determining whether the economic realities of the transaction establish that Park Western

10  obtained a meaningful residual interest, but that it may also consider any number of other facts

11  for the purposes of determining whether the parties entered into a true lease or a disguised

12  security agreement.

13          Having previously determined that the Debtor did not provide adequate valuation

14  evidence to establish that the purchase price is nominal, the Court need not repeat its Bright-Line

15  Test valuation analysis.  Instead, the Court will focus on other relevant facts which existed at the

16  time the parties entered into the agreements, such as those events which occurred before and at

17  the time the parties entered into Agreement Nos. 409 and 410.[18]

18          Prior to entering into Agreement Nos. 409 and 410, the Debtor approached Park

19  Western, to obtain operating capital for the Debtor's operations.  The Debtor estimated that it

20  needed between $350,000 - $500,000 in financing.  In order to determine whether it could

21  provide such financing, Park Western requested a list of all of the Debtor's unencumbered assets.

22  From this list, Park Western determined that the Debtor had sufficient value in its assets to

23  facilitate the transaction.  Accordingly, Park Western selected eighteen items of the Debtor's

24  equipment, a majority of which ranged in age from eight to twelve years, which it "purchased"

25      **18.** While the Court must still consider whether Agreement No. 407 was a disguised

26  security agreement, the parties focused on the events which occurred prior to or at the time they
    entered into Agreement Nos. 409 and 410.  Accordingly, the Court will focus its analysis on

27  those Agreements.

28                                          17

from the Debtor. Fourteen of the eighteen items had certificates of title, issued by the Arizona

Motor Vehicle Division, so Park Western obtained possession of the titles. Seven items of titled

equipment were listed in Agreement No. 409, the balance of the items of titled equipment were

listed in Agreement No. 410. The remaining four, untitled items of equipment were listed in two

separate Additional Collateral Agreements. In order to secure its interest in the non-titled

equipment, Park Western properly filed the Additional Collateral Agreements and UCC

Financing Statements with the Arizona Secretary of State. According to Mr. Stern, the Debtor's

principal, the items it sold to Park Western constituted a majority of the Debtor's equipment,

without which the Debtor could not survive as a going concern.

Agreement Nos. 409 and 410 both had a duration of forty-eight months, and

while the agreements did not provide for an option to purchase the equipment, as previously

discussed, the parties' course of dealing established that the Debtor had a right to purchase the

equipment for 10 percent of the original cost of the equipment. As with the prior contracts, the

Debtor also entered into Continuing Cross-Collateralization Agreements, which allowed Park

Western, at its discretion, to retain its security interest in the equipment if the Debtor exercised

its purchase option.

Considering these agreements within the greater context of the parties'

relationship establishes that Agreement Nos. 409 and 410 were, in fact, sophisticated financing

agreements. Although there are a variety of facts which are useful in coming to this conclusion,

the most critical facts are those associated with the Debtor's ability to exercise a purchase option

on any of the items of equipment. The Court observes that irrespective of the original terms of

the agreements, or the value or use of the equipment, the Debtor retained the right to purchase

the equipment for a constant option price of 10 percent of the original cost of the equipment. For

example, while Agreement No. 407 had a duration of sixty months, and Agreement Nos. 409

and 410 had a duration of forty-eight months, the purchase option for the equipment remained

the same. Furthermore, while earlier agreements involved the purchase of brand new equipment

18

to be utilized by the Debtor in its operations, Agreement Nos. 409 and 410 consisted of

equipment which, on average, ranged in age from 8 - 12 years.  How is it that brand new

equipment depreciates at exactly the same rate as used equipment, and why has the purchase

option been set at the same percentage no matter the age of the equipment or how the equipment

is used in the Debtor's operations?  It also makes no sense that the Debtor, who desired to

remain an ongoing concern, would provide all of its equipment used in its operations and which

in many cases was unencumbered to Park Western, relinquishing all indicia of ownership to the

equipment.  Accordingly, the only reasonable conclusion is that the 10 percent purchase option

was not, in fact, Park Western's attempt at the inception of the agreements to place a fair market

value on the equipment at the end of the lease term.  Instead, the Court finds that Park Western

included a purchase option price that bore no relation to the anticipated fair market value of the

equipment at the expiration of the agreements.

        To understand the purpose of the 10 percent purchase option, the Court focuses

on two specific facts.  First, throughout the seven-year relationship of the parties, the Debtor

always exercised the purchase option, never returning any equipment to Park Western.  Second,

to enter into Agreement Nos. 409 and 410, the Debtor needed to sell Park Western most of its

equipment, without which the Debtor would have been unable to operate.  Mr. Stern, the

Debtor's principal,  also testified that had the Debtor not been able to repurchase the equipment

at a price less than what it thought the equipment at the expiration of the agreements was worth,

it would not have entered into the agreements.  In essence, the Debtor needed financing, not a

lease arrangement.

        Based upon these facts, the Court finds that the 10 percent purchase option was

not an estimate of the anticipated fair market value of the property at the expiration of the

agreement.  In fact, the application of the 10 percent purchase option to all of the items of

equipment, given the myriad differences between the items of equipment, leads the Court to

conclude that the 10 percent purchase option was chosen by Park Western for one of two

19

reasons. Either Park Western included the purchase option to disguise the fact that it was entering into a secured transaction, or given the fact that the Debtor desperately needed financing to continue with its operations, Park Western set the purchase option at a nominal amount in order to guarantee that the Debtor's only reasonable economic choice to remain in business was to exercise the purchase option. It does not matter which alternative motivated Park Western to act, the Court finds that either alternative evidences the creation of a disguised security agreement, rather than a lease. Accordingly, the Court finds that Agreement Nos. 407, 409, and 410 are disguised security agreements.

## IV. CONCLUSION

The Court has analyzed the parties' agreements, pursuant to A.R.S. § 47-1203, to determine whether the parties' agreement constitutes a true lease or a disguised security agreement. The Court concludes that under the Bright-Line Test, the Debtor has shown that it did not have the ability to terminate any of the agreements with Park Western. However, the Debtor failed to provide sufficient evidence to reflect one of the four objective factors necessary under the Test. However, under the second, less rigid test which considers additional facts, the Court finds that at the time the parties entered into Agreement Nos. 407, 409, and 410, the Debtor required financing to continue with its operations. At that time, Park Western established an arbitrary amount for the Debtor to exercise the purchase option on the items of equipment at the expiration of the agreements, which amount was set low enough to guarantee that the Debtor would have no choice but to purchase the equipment at the expiration of the agreements to remain in business. Accordingly, the Court concludes that Agreement Nos. 407, 409, and 410 are disguised security agreements.

20

DATED this 30th day of September, 2009.

_Sarah Sharer Curley_

Honorable Sarah Sharer Curley
U. S. Bankruptcy Judge

21